## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW CARLSEN, individually and on behalf of all others similarly situated, | Case No. 14-cv-03131-DFW-SER |
| *Plaintiff*, | |
| *v.* | |
| GAMESTOP, INC., a Minnesota corporation, and SUNRISE PUBLICATIONS, INC. d/b/a GAME INFORMER, a Minnesota corporation, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff Matthew Carlsen ("Carlsen") brings this First Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants GameStop, Inc. ("GameStop") and Sunrise Publications, Inc. d/b/a Game Informer ("Sunrise") (collectively, "Defendants") to put an end to, and obtain redress for, their unlawful practice of disclosing their subscribers' sensitive information. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

### NATURE OF THE ACTION

1.      Defendants publish Game Informer magazine, a monthly print and online publication that offers news, reviews, and commentary about the video game industry ("Game Informer"). Game Informer has over eight million paid subscribers and is

currently the third largest magazine publication in the United States. Defendants also operate a website (www.GameInformer.com) that allows registered subscribers to access digital versions of the Game Informer magazine, manage their Game Informer subscriptions, and access "enhanced content and message boards, among other items."[1]

2.　　　A one-year subscription to Game Informer typically costs $19.98. The publication is available both in print form and digitally through Defendants' website. Subscribers to the print edition register online to manage their subscription account, while digital subscribers must use an online account to access their digital copy of the magazine. Digital subscribers cannot access their paid-for subscriptions without creating and registering an account on the Game Informer website.

3.　　　Subscribers must agree to Game Informer's Terms of Service when accessing the Game Informer website and its online services. The Terms of Service include Game Informer's User Agreement and Privacy Policy, which "applies . . . to information submitted and collected online through the Site," explains "Game Informer's treatment of personally identifiable information collected when you are on the Site and when you use the Service, and . . . discloses Game Informer's information gathering and dissemination practices for the Site and the Service."[2] The Terms of Service further state that "[t]he User Agreement and the Game Informer Terms of Service contain the entire agreement between you and Game Informer regarding the use of the Site and/or the

---

[1]　　　*Game Informer's User Agreement*, http://www.gameinformer.com/p/terms.aspx (last visited November 5, 2014).

[2]　　　*Game Informer's Privacy Policy*, http://www.gameinformer.com/p/privacy.aspx (last visited November 5, 2014).

Service."[3]

4.      As part of the Terms of Service, Defendants promise their subscribers that their personally identifiable information ("PII") won't be automatically collected by or shared with any third party companies while browsing the Game Informer website.

5.      Unfortunately for their subscribers, and despite express promises to the contrary, Defendants routinely disclose subscribers' PII to third party Facebook, along with the precise materials that they're viewing—including the titles of articles read and videos watched. These practices are particularly concerning here since the recipient, Facebook, is capable of combining this information with its already massive and detailed database of individual consumers and is in the business of selling access to the same.

6.      Had Defendants informed their subscribers at the time of their purchases that they would disclose their PII to third party companies when browsing their website (including when subscribers use the website to access their paid-for online subscriptions to the Game Informer magazine), they would not have been willing to purchase their subscriptions at the price charged, if at all. Thus, because Defendants failed to disclose their actual practices, they delivered to Plaintiff and the Class a fundamentally less useful and less valuable service than the one they paid for.

7.      In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information. Defendants chose to disregard Plaintiff's and thousands of other users' paid-for privacy rights by releasing their

---

[3]      *See Game Informer's User Agreement*, *supra* note 1.

sensitive data into the marketplace. Accordingly, this putative class action lawsuit seeks (i) to prevent Defendants from continuing to disclose their subscribers' sensitive data without permission, and (ii) damages for those deceived into paying for Defendants' services under false pretenses.

## PARTIES

8.     Plaintiff Matthew Carlsen is a natural person and citizen of the State of New Hampshire.

9.     Defendant GameStop, Inc. is a corporation existing under the laws of the State of Minnesota, with its headquarters located at 625 Westport Parkway, Grapevine, Texas 76051. GameStop, Inc. describes Game Informer as a "GameStop" brand, sells consumer subscriptions to Game Informer, and, on information and belief, operates the Game Informer website with Sunrise. GameStop, Inc. conducts business throughout this District, the State of Minnesota, and the United States.

10.     Defendant Sunrise Publications, Inc. is a corporation existing under the laws of the State of Minnesota, with its headquarters located at 724 North 1st Street, 4th Floor, Minneapolis, Minnesota 55407. Sunrise Publications, Inc. is a wholly-owned subsidiary of GameStop, Inc. Defendant Sunrise Publications, Inc. publishes Game Informer magazine and, with GameStop, operates Game Informer's website. Sunrise Publications, Inc. conducts business throughout this District, the State of Minnesota, and the United States.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1332(d)(2), because (a) at least one member of the putative Class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under the subsection apply to this action.

12.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in this District, conduct significant business transactions in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District. Additionally, Sunrise is headquartered in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Sunrise maintains its headquarters and principal place of business in this District and a substantial part of the events giving rise to Plaintiff's Complaint occurred in this District.

## FACTUAL BACKGROUND

## I.    Defendants Promise Not to Disclose PII to Third Parties.

### A.    A brief introduction to Game Informer.

14.     Game Informer was founded in 1991 with the release of the first issue of its eponymous magazine. Today, Game Informer is distributed to over eight million subscribers per month, making it the third largest magazine in the United States by circulation.[4]

15.     Game Informer generates substantial revenue for Defendants through

---

[4]     *About Game Informer*, http://www.gameinformer.com/p/corporateinfo.aspx (last visited June 16, 2014).

subscriptions to the Game Informer magazine. Subscriptions are available in both print and digital form. A one-year subscription to Game Informer typically costs $19.98.

16.     Consumers may also purchase subscriptions to Game Informer through GameStop's websites or services (*e.g.*, through GameStop's PowerUp Rewards membership program).

17.     Regardless of how an individual subscribes, a portion (if not all) of the magazine's subscription benefits are only available and accessible through the Game Informer website. All digital subscribers are required to register for an account on Game Informer's website in order to gain access to their subscriptions. Print subscribers are also required to create an account on the Game Informer website in order to manage their subscription online and access exclusive content and message boards that are only available on the website.

18.     Accordingly, a portion of a Game Informer subscription's value is derived from its online-only features.

19.     The need for information security and privacy is particularly essential for consumers who must go online to access and receive their paid-for services, as online services (such as the Game Informer website) require consumers to submit personal information in order to receive what they've paid for. Consumers reasonably believe that providers of such online services—who are entrusted with their information—will take steps to protect their information and privacy.

20.     Further, when consumers pay for services and products with online features, they expect heightened levels of information security and privacy relative to

6

when they use free online services. This is, in part, because they believe that some portion of the money they pay for their memberships goes toward the protection of their sensitive information.

21.     Thus, when purchasing Game Informer subscriptions (which required that they register for their accounts online to receive all or some of their paid-for benefits), subscribers expected that Defendants would provide such security and privacy—including, at minimum, the confidentiality of their PII when accessing/using Defendants' online subscription services.[5]

22.     These minimal confidentiality expectations are further justified when companies make affirmative representations regarding their protection of user information.

23.     As described above, the Game Informer website—located at www.gameinformer.com—is operated by Defendants (i.e., by GameStop as a "brand" of GameStop and a part of its larger "GameStop Network," and by Sunrise, as described in the Game Informer Terms of Service). Thus, Defendants control, *inter alia*, (i) all subscriber information collected by and through the Game Informer website, (ii) access to personal subscriber data through the Game Informer website (including access granted to any third parties), and (iii) all automatic disclosures of subscribers' personal data from the Game Informer website to third parties.

### B.     Registering for an online account.

---

[5]     Recent studies confirm that consumers price privacy into their purchases. *See* Expert Witness Report of Dr. Serge Egelman, Ph.D., *In re LinkedIn User Privacy Litig.*, No. 5:12-cv-3088-EJD, Dkt. No. 78-1, at 4-6 (N.D. Cal. Apr. 30, 2013).

24.     During the registration process for Game Informer's website, subscribers create login credentials by inputting a sign-in name, email address, and password. The process is completed when the user indicates the type of subscription that they have (whether print or digital) and clicks a "Start" button.

25.     <u>Figure 1</u> shows Game Informer's account registration webpage.



(**<u>Fig. 1.</u>**)

26.     According to Game Informer's Terms of Service, all registered users of the Game Informer website agree to all the terms of both Game Informer's User Agreement and Privacy Policy.[6]

---

[6]     Game Informer's User Agreement and Privacy Policy (together, the "Terms of

### C.    *Game Informer's Privacy Policy.*

27.    Game Informer's Privacy Policy governs the types of information that Defendants collect through the Game Information website, how such information is collected, and to whom the information is transmitted while a registered user navigates the website. One section deserves special attention here. Namely, Section 5 of the Privacy Policy states that, "Game Informer does not share personal information with anyone."[7] Certain exceptions to Defendants' publicly described disclosure practices are also listed in the Game Informer Privacy Policy—including disclosures required to protect its users' security, when users affirmatively provide information for special events (such as contests and tournaments), and for "operational uses" such as shipping and handling.[8]

28.    Nowhere among these stated exceptions do Defendants reveal that they, through the Game Informer website, actually disclose users' PII to third party advertisers or social networks as a matter of regular course. In fact, the Game Informer Privacy Policy only states that "[n]etwork advertisers who place advertisements on our Websites

---

Service") is the sole agreement consumers must follow while using Game Informer's website, even where consumers purchase Game Informer subscriptions through GameStop's websites or services. *See GameStop Privacy Policy*, http://www.gamestop.com/gs/help/PrivacyPolicy.aspx (last visited July 22, 2014) ("GameStop brands such as BuyMyTronics, Game Informer, PC Downloads, or Kongregate, [have their] own conditions of use").

[7]    *Game Informer's Privacy Policy*, *supra* note 2.

[8]    Section 5 of the Privacy Policy notes that personal information may be collected by or shared with certain third parties when users submit information for special events on the site, such as contests, tournaments, or other activities. The Policy, however, assures users that the information will only be collected or shared in such a way if the user decides to participate in these events and, in the course thereof, affirmatively provides personal information.

may also use cookies and Web beacons[9] to collect *non*-personally identifiable

information when you click on or move your cursor over one of their banner

advertisements."[10]

29.    This is significant, because contrary to Defendants' promises and

representations described above, an inspection of the data transmitted while visiting

Game Informer's website reveals that Defendants systematically disclose Game

Informer's users' PII (including the user's Facebook identification number and the name

of each article read and video viewed by the individual) to third party Facebook and/or

allow Facebook to directly collect that information itself. As explained in <u>Section II</u>

below, these actions directly violate Game Informer's Privacy Policy and its subscribers'

privacy rights.

30.    A user's Facebook identification number is personal information governed

by Defendants' Privacy Policy because it is associated with a user's specific Facebook

profile, which can contain, among other things, their name, date of birth, and location.

## II.    Defendants Violate the Game Informer Privacy Policy by Disclosing Their Users' PII to Facebook.

31.    The transmission of users' PII from Game Informer's website to

Facebook's servers is accomplished using code developed by Facebook that operates on

---

[9]     According to the Privacy Policy, "Cookies are small electronic data files that Websites can store on a User's computer for record keeping purposes. For example, cookies will remember what you've placed in your shopping cart, and tell us that you have visited one of our Websites before . . . Web beacons (also known as "web bugs") are small strings of code that provide a method of delivering a graphic image on a web page or in an email message for the purpose of transferring data." *See id*.

[10]     *Id.* (emphasis added).

Game Informer's website. The following is a brief explanation of the technology and how it's used by Defendants to disclose subscriber PII from the Game Informer website.

> ### A.   An explanation of how companies implement Facebook's SDK on their websites.

32.     Facebook is a social networking website and data broker that offers a Software Development Kit ("SDK")[11] that allows companies to add Facebook-related features to their websites. These features permit the company's website to interact with Facebook in various ways.[12] Examples include "Facebook Login," which lets visitors login to a website using their Facebook credentials, and "Facebook Social Plugins," which lets visitors use Facebook's "Like," "Share," or "Comment" functions.

33.     Typically graphics are also added onto the webpage using Facebook's SDK. For instance, <u>Figures 2 and 3</u> below show how the Facebook Login and Facebook Social Plugin graphics may appear on a website, respectively.



(**Fig. 2.**)

(**Fig. 3.**)

34.     To make use of the SDK, a company must first add Facebook's source code

---

[11]     A Software Development Kit generally refers to a set of software development tools that allow computer programmers to develop applications that can interface with a specific software platform.

[12]     *Facebook SDK for JavaScript*, https://developers.facebook.com/docs/javascript (last visited June 9, 2014).

to its website.[13] This code is customizable, and allows the company to choose which features to include (*e.g.*, Facebook Login, or Social Plugins).

35.    The Facebook SDK also relies in part on cookies. When a person visits a website using the SDK (*e.g.*, a webpage that includes a Facebook Social Plugin), the code attempts to force the visitor's web browser to check whether certain cookies exist on their computer.

36.    One of the cookies that Facebook's code forces the web browser to look for is "**c_user**," which contains the user's "Facebook ID." The Facebook ID is a numeric string assigned by Facebook to a specific user when their account is first created. This string may be inputted into a web browser to view an individual's "profile" page, thus making it a personal identifier.[14]

37.    The "**c_user**" cookie is placed onto a person's computer when first logging in to Facebook. A checkbox on Facebook's main login screen reads, "Keep me logged in." (*See* <u>Figure 4,</u> below.) The **"c_user"** cookie remains on the computer of users who select this checkbox, regardless of whether they close their web browser.



(**Fig. 4.**)

38.    When a person visits a webpage that includes the SDK, Facebook's code

---

[13]    *Quickstart: Facebook SDK for JavaScript,* https://developers.facebook.com/docs/javascript/quickstart/v2.0 (last visited May 28, 2014).

[14]    For example, a Facebook ID may be plugged into a web browser using the following URL to access a person's individual Facebook profile: www.facebook.com/profile.php?id=<Facebook ID>.

causes their web browser to create a connection with Facebook's servers. Once

connected, and depending on the Facebook SDK configuration chosen by the website's

owner, data about the user's web browsing may be silently transmitted back to Facebook.

In Game Informer's case, it chose to transmit the subscriber's Facebook ID, as well as the

articles read and videos viewed by the individual.

> **B.      Defendants configured the Game Informer website to send PII to Facebook.**

39.      Defendants configured the Game Informer website to make full use of

Facebook's SDK, resulting in the routine transmission of user PII to Facebook as Game

Informer website users browse the site—including those portions of the site only

accessible to paid-subscribers.

40.      Game Informer's website uses Facebook's SDK and embeds the Facebook

Like Social Plugin on its webpages (circled in red in <u>Figure 5</u>).



(**Fig. 5.**)

41.     When a user initially visits Game Informer's homepage, they are presented

with a screen showing featured content, as well as access to news, reviews, previews, and

more. Figure 6, shows a screenshot of the Game Informer home page.



(**Fig. 6.**)

42.     Throughout the Game Informer homepage (shown in Figure 6, above) are

hyperlinks to articles, video, and various other content for registered users. As the user

clicks on these hyperlinks, the Social Button Plugin (*i.e.*, the "Like" button) loads

automatically as the target webpage loads. Then, each Game Informer page initiates a

transmission to Facebook called "/plugins/like.php?" which contains values from the

**c_user** cookies and the full URL of the article or video webpage, as illustrated in Figure

7, on the following page.

//



(**Fig. 7.**)

43.     As a result of these data transmissions, Facebook receives a full record of: (i) the Facebook ID of the visitor browsing Game Informer's website, along with (ii) the exact titles of the content they viewed. Not only do these actions run contrary to Defendants' promises made through Game Informer's Privacy Policy, they also create serious privacy risks for its subscribers, as detailed in Section III below.

**III.     The Privacy Hazards Created by Game Informer's Unlawful Disclosures.**

44.     An entire industry is now devoted to the collection and commercialization of consumer data.[15] Companies in this industry—known as data brokers—develop, share, and sell comprehensive profiles containing details about every aspect of individuals' digital lives.

45.     A Senate Committee hearing on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy recently addressed this issue. There, United States

_____

[15]     *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes*, Staff Report for Chairman Rockefeller (Dec. 18, 2013).

Senator Carl Levin noted that, "as consumers use the internet, profiles are being created based on what they read, what movies they watch, what music they listen to, on and on."[16]

46.     Although primarily recognized for its eponymous social network, Facebook is also a data broker.[17] With over 130 million users in the United States alone,[18] Facebook has exclusive access to an exorbitant amount of personal consumer data. This wealth of information feeds into an analytics and advertising platform that Facebook markets to clients across a wide spectrum of industries.

47.     Facebook is uniquely able to directly link the data they accumulate on individuals' digital behaviors with the additional personal data that it extracts from its users' Facebook accounts. The result is that Facebook obtains a holistic look at specific consumers' online behaviors.

48.     Not surprisingly, Facebook recently announced that it was going to start providing advertisers with access to the highly detailed data that it collects from millions of consumers online.[19] In return, advertisers will pay enormous fees for access to

---

[16]     *Opening Statement of Senator Carl Levin Before Permanent Subcommittee on Investigations on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy* (May 15, 2014).

[17]     *Facebook Moves to Become World's Most Powerful Data Broker*, http://www.forbes.com/sites/parmyolson/2014/04/30/facebok-moves-to-become-the-worlds-most-powerful-data-broker/ (last visited May 28, 2014).

[18]     *Internet World Stats: Usage and Population Statistics*, http://www.internetworldstats.com/stats26.htm (last visited, June 3, 2014).

[19]     Chris Morran, *Facebook Is Now Selling Your Web-Browsing Data To Advertisers*, The Consumerist (June 12, 2014), http://consumerist.com/2014/06/12/facebook-is-now-selling-your-web-browsing-data-to-advertisers/; *see also* Facebook, *Making Ads Better And Giving You More Control*,

Facebook's highly valuable and comprehensive dossier of information about consumers.[20]

## IV.  Plaintiff Carlsen's PII Was Disclosed by Game Informer to Facebook Without His Permission.

49.     Plaintiff has been a member of Facebook's social network since early 2009. Since then, Plaintiff has frequently accessed his Facebook account through his web browser and has clicked the "Keep me logged in" button when signing into the account.

50.     In or around January 2014, Plaintiff Carlsen purchased a PowerUp Rewards Pro membership from GameStop for approximately $14.99. Plaintiff purchased the membership, in part, because he wanted to receive the one-year digital subscription to Game Informer that was included in the PowerUp Rewards Pro membership.

51.     Accordingly, at the time that Carlsen paid for his PowerUp Rewards Pro membership, he understood that he was paying money for digital content that could only be accessed through Defendants' Game Informer website.

52.     Additionally, at the time he paid for his PowerUp Rewards Pro membership, Carlsen valued his personal privacy and expected that Defendants would take measures to protect his personal information when he accessed his paid-for digital subscription online through Defendants' website.

53.     After receiving his PowerUp Rewards Pro membership, Plaintiff navigated to Defendants' Game Informer website to register for an online account so that he could

---

https://www.facebook.com/help/585318558251813?ref=notif&notif_t=oba (last visited June 16, 2014).

[20]     *Id.*

access his paid-for digital subscription to the Game Informer magazine. As a condition of

his registration, and through his use of the website, Carlsen agreed to the Game Informer

website Terms of Service (including the Privacy Policy) and the representations and

obligations listed therein.

54.     The Terms of Service governing Carlsen's Game Informer website account

stated that it constitutes "the entire agreement between [him] and Game Informer

regarding the use of the Site and/or the Service."[21] The Terms of Service governing

Carlsen's account included Game Informer's Privacy Policy.[22]

55.     In the Game Informer Privacy Policy, Defendants represented that they

wouldn't share their users' PII with any third party companies while users browsed the

Game Informer website unless the user provided his specific authorization for such

sharing, e.g., by participating in special events such as online contests or tournaments.[23]

56.     Because online registration was required to access his paid-for digital

subscription to Game Informer, Carlsen believed that Defendants would not disclose his

PII while he used the Game Informer website without his permission and believed that

Defendants confirmed that belief based upon the representations contained in the Game

Informer Privacy Policy.

57.     Nevertheless, and despite the fact that Carlsen did not consent, agree, or

otherwise permit Defendants to disclose his PII to any third party company (whether

through participation in any contest or otherwise), when he used Game Informer's

---

[21]     *See Game Informer's User Agreement*, *supra* note 1.
[22]     *Id.*
[23]     *See Game Informer's Privacy Policy*, *supra* note 2.

website and was separately logged into Facebook's website, Defendants—through the Facebook SDK code they integrated into the Game Informer website—routinely disclosed his PII to third party social network, Facebook, along with the precise materials that he viewed—including the titles of articles read and videos watched.

58.     Had Defendants disclosed that they would share his PII with third parties (including Facebook) as a matter of course (i.e., each time he utilized the Game Informer website), Carlsen would have been aware—through viewing the Privacy Policy and/or through the popular media—of the same. Accordingly, had Defendants disclosed that they would share his PII with third parties, he would have either (i) not paid for a PowerUp Rewards Pro Membership (and included Game Informer subscription) at all; (ii) returned his PowerUp Rewards Pro Membership within the seven day return period; or (iii) would have elected not to access his Game Informer subscription digitally (and would have, thus, given up aspects of the services he paid for).

## CLASS ALLEGATIONS

59.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All current and former Game Informer subscribers who (i) paid a subscription fee to Defendants (ii) created an account on the Game Informer website, and (iii) had their PII disclosed to Facebook without permission while visiting Game Informer's website.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a

19

controlling interest, and those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

60.   **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. Class members can be easily identified through Defendants' records.

61.   **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a)   Whether Defendants, through the Game Informer website, unlawfully disclosed and continue to unlawfully disclose their users' PII;

b)   Whether Defendants' actions violate Minnesota's Prevention of Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq.*);

c)   Whether Defendants' disclosures were committed knowingly;

d)   Whether Defendants' actions constitute unjust enrichment

e)   Whether Defendants' actions constitute money had and received;

and

f)      Whether Defendants' actions constitute breach of contract.

62.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

63.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

64.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class.

Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

65.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

66.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**<u>FIRST CAUSE OF ACTION</u>**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

67.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

68.     In order to use Defendants' Game Informer website and access their paid-for subscription benefits, subscribers are required to agree to the Game Informer Terms of Service. Defendants' Game Informer Privacy Policy (part of its overall Terms of Service) contained representations regarding the collection and use of their members' PII.

69.     Plaintiff Carlsen agreed to the Terms of Service, and with it, Game Informer's Privacy Policy and representations regarding the handling of his PII, when registering for his online account and subsequently using the Game Informer website.

70.     Plaintiff Carlsen had no way to access his paid-for digital subscription benefits without (i) registering for an online account and then (ii) using the Game Informer website.

71.     The Terms of Service constitute a valid and enforceable contract between Plaintiff Carlsen and Defendants.

72.     As part of this contract, Defendants promised to not disclose their subscribers' PII to third party companies unless specifically authorized to do so by such member.

73.     Defendants' promise not to disclose their subscribers' PII to third parties constituted a material term of the contract.

74.     Carlsen performed all of his obligations under the contract, including paying for his Game Informer subscription.

75.     Facebook is an unrelated third party company.

76.     By disclosing Carlsen's PII—including a record of his online activities and his Facebook ID—to Facebook, Defendants breached a material term of their contract

23

with Plaintiff. Namely, that they wouldn't disclose his PII to third parties without his authorization.

77.     Consumers, including Internet users, value their privacy. Services, such as those provided by companies offering online account access, that offer greater privacy protection offer consumers greater usefulness and utility than services with minimal or no privacy protection. As such, Defendants' services were fundamentally less useful and valuable than if they were to adhere to the privacy-related representations contained in the Game Informer Privacy Policy.

78.     Carlsen believed that, as part of his paid-for Game Informer subscription and online account, Defendants would not disclose his PII to any third party companies without his authorization—a service and commitment that was valuable to him.

79.     Thus, Carlsen paid for, but never received, the valuable privacy protection to which he was entitled. That protection would have made his Game Informer subscription significantly more valuable to him and would have allowed him to access the entirety of his paid-for subscription benefits without being forced to subject himself to Defendants' undisclosed PII collection practices.

80.     As a result of Defendants' breach of contract, Plaintiff and the Class suffered damages in the form of their overpayment for their Game Informer subscriptions (in the amount equal to the difference between the value of the subscription that they paid for and the value of the subscription that they received).

81.     Accordingly, Plaintiff, on behalf of himself and the other Class members, seeks an order declaring that Defendants' conduct constitutes breach of contract, and

awarding Plaintiff and the Class damages in the amount equal to the difference between the value of the services they paid for and the services they actually received.

## SECOND CAUSE OF ACTION
### Unjust Enrichment (*in the alternative to breach of contract*)
### (On Behalf of Plaintiff and the Class)

82. Plaintiff incorporates the foregoing allegations as if fully set forth herein, excluding Paragraphs 67 to 81.

83. Defendants knowingly received a direct monetary benefit from their subscribers, including from Plaintiff and the Class, in the form of subscription fees. Plaintiff and Class paid such fees to access/receive the content and services offered by Defendants—including the data protections described in Defendants' Game Informer Terms of Service.

84. Although they received money in payment for them, Defendants did not provide the data protection services set forth in their Terms of Service. Defendants, however, retained the entirety of Plaintiff's and the Class's payment.

85. Defendants appreciate or have knowledge of such monetary benefits.

86. Under principles of equity and good conscience, Defendants should not be permitted to retain the benefits they wrongly received from Plaintiff and the Class as a result of their unlawful conduct.

87. Plaintiff, individually and on behalf of the Class, seeks restitution of all monies Defendants have unjustly received as a result of the conduct alleged herein

## THIRD CAUSE OF ACTION
### Money Had and Received (*in the alternative to breach of contract*)
### (On Behalf of Plaintiff and the Class)

88.     Plaintiff incorporates the foregoing allegations as if fully set forth herein, excluding Paragraphs 67 to 81.

89.     Defendants have received money, in the form of Game Informer subscription fees, from Plaintiff and the Class.

90.     Defendants appreciated a benefit from that money, especially because Defendants demanded, accepted, and/or retained it without providing (or intending to provide) aspects of the services that their subscribers (including Plaintiff and the Class) paid for.

91.     Defendants had no right to demand, accept, and/or retain that money, given that they did not provide (or intend to provide) aspects of the services that their subscribers (including Plaintiff and the Class) paid for.

92.     The money subscribers paid to Game Informer to, *inter alia*, implement and enforce the data protections described in Defendants' Game Informer Terms of Service should, in equity and good conscience, be returned to Plaintiff and the Class.

93.     Plaintiff, individually and on behalf of the Class, seeks restitution of the sums of money Defendants have unjustly received and retained as a result of the conduct alleged herein.

## FOURTH CAUSE OF ACTION
### Violation of Minnesota's Prevention of Consumer Fraud Act
### Minn. Stat. §§ 325F.68, *et seq.*
### (On Behalf of Plaintiff and the Class)

94.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

95.     Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et*

*seq.* ("CFA"), protects consumers from a wide range of fraudulent and deceptive trade practices.

96.     The CFA prohibits the act, use, or employment of fraud, false pretense, misrepresentation, misleading statement or deceptive practice in connection with any merchandise.

97.     Minn. Stat. § 8.31 provides that "any person injured by a violation of any of the laws referred to in subdivision 1 (including the CFA) may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

98.     When Plaintiff and the Class purchased their Game Informer subscriptions and then registered for their online Game Informer accounts, they expected that Defendants would not disclose their PII to third parties.

99.     Plaintiff's and the Class's expectations were justified by the fact that Defendants promised in Game Informer's Privacy Policy that they would not disclose their users' PII to any third party companies without their consent or unless specifically authorized.

100.    By sending their subscribers' Facebook IDs, along with the content they viewed, as a matter of routine course, Defendants supplied their online users' PII to third party data broker, Facebook. Subscribers did not provide this information to Defendants in the context of any special event or promotion or otherwise affirmatively consent to such disclosures. Thus, Defendants falsely represented in Game Informer's Privacy

27

Policy the fact that they would not disclose such information.

101.    Defendants were responsible for maintaining the privacy of their users' PII in accordance with Game Informer's Privacy Policy. Defendants knew they were disclosing Game Informer subscribers' PII to Facebook inasmuch as they designed the Game Informer website and intentionally included Facebook's code for the "Like" Social Plugin. By representing in Game Informer's Privacy Policy that such information would not be disclosed, Defendants actively and knowingly misrepresented their true practices from Plaintiff and the Class. In doing so, Defendants intended to induce users to purchase and register their subscription for an online account.

102.    Consumers value their privacy. Services that offer greater privacy protections are of greater usefulness and utility to consumers than services with less stringent privacy practices. As such, consumers will—if given the choice between two otherwise identical services—choose one with greater privacy protection.

103.    Because of this consumer preference for privacy, an Internet service that protects its users' PII—and, of course, adheres to its published privacy policy—commands a higher market price than a service with limited privacy protection.

104.    Consumers pay subscription fees to Defendants in order to receive their magazine and access their online accounts. When a subscriber signs up for Game Informer's website, he or she reasonably believes that Defendants will protect their PII and not disclose the same (unless specifically authorized to do so), as represented in Game Informer's Privacy Policy. By failing to do so, Defendants made a material misrepresentation, which was misleading to any reasonable consumer acting under the

circumstances. If members were aware of the true treatment of their PII, they would not have paid the full price for their Game Informer subscriptions, or would not have paid at all.

105.    Accordingly, Plaintiff and the Class overpaid for their Game Informer subscriptions and suffered damages in the amount equal to the difference between the value of the product they paid for and the value of the product they actually received.

106.    Plaintiff and the Class's damages were caused by the material misrepresentations made by Defendants in the Game Informer Privacy Policy inasmuch as the misrepresentations prevented Plaintiff and Class from learning about the true nature of Defendants' information protection practices.

107.    Accordingly under the CFA and Minn. Stat. § 8.31, Plaintiff and the Class seek an injunction requiring Defendants to cease and desist the illegal conduct alleged in this Complaint and all other appropriate remedies for their violations of the CFA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Matthew Carlsen, individually and on behalf of the Class, prays for the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Matthew Carlsen as representative of the Class, and appoint his counsel as Class Counsel;

B.    Declare that Defendants' actions, as described herein, violate Minnesota's Prevention of Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq*) and constitute breach of contract, or, in the alternative, unjust enrichment and money had and received;

C.      Award injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class members, including an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

D.      Award appropriate damages and restitution to Plaintiff and the Class in an amount to be determined at trial;

E.      Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.      Award such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**MATTHEW CARLSEN**, individually and on behalf of all others similarly situated,

Dated: November 7, 2014          By: /s/Alicia E. Hwang
                                 One of Plaintiff's Attorneys

                                 Rafey S. Balabanian*
                                 rbalabanian@edelson.com
                                 Benjamin S. Thomassen*
                                 bthomassen@edelson.com
                                 Alicia E. Hwang* (IL Bar No. 6309294)
                                 ahwang@edelson.com
                                 EDELSON PC
                                 350 North LaSalle Street, Suite 1300
                                 Chicago, Illinois 60654
                                 Tel: 312.589.6370
                                 Fax: 312.589.6378

*Admitted *Pro Hac Vice*

Robert K. Shelquist (Attorney No. 21310X)
rkshelquist@locklaw.com
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Tel: 612.339.6900
Fax: 612.339.0981